**UNITED STATES DISTRICT COURT**

**DISTRICT OF NORTH DAKOTA**

**Kirubel Zelalem Seifu, Plaintiff** v. **North Dakota State University (NDSU), Defendant**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I. INTRODUCTION

1. Plaintiff brings this action against North Dakota State University ("NDSU") for its categorical exclusion of divinity and theological education. This exclusion violates the Equal Protection Clause (14th Amendment), burdens the Free Exercise Clause (1st Amendment), and suppresses academic freedom.

2. By supporting secular disciplines in engineering, agriculture, and the arts while excluding divinity, NDSU enforces a secular-only, neuroconformant bias: left-brain analytic modes dominate, while right-brain creativity and frontal-brain coherence (prefrontal cortex activation, prayer, moral judgment) are marginalized.

3. Plaintiff is recognized as an alien of extraordinary ability/petitioner, having contributed to scientific, educational, and spiritual advancement.

4. Plaintiff is the **founder of a new Christian denomination**, *His Forgiving Love*, which establishes **global alliances based on newly observed brain states**, aimed at cultivating the next generation of leaders—**presidents, soldiers, astronauts, and mission-critical personnel**—capable of unlocking and exercising their flattened extraordinary abilities.

5. Plaintiff, as an independent researcher and scholar, pursued studies in international law and human rights under the guidance of Professor Beth Simmons at Harvard University, with a particular focus on equitable access to education and moral development. In her seminal work, *Mobilizing for Human Rights: International Law in Domestic Politics*, Professor Simmons demonstrates that the ratification of human rights treaties does not remain a symbolic act, but rather serves as a catalyst for domestic mobilization and can generate tangible improvements in the protection of human rights. Plaintiff was directly instructed in this framework, which informs his advocacy for integrating faith, education, and human dignity into contemporary legal and academic systems.

6. Plaintiff has served as a legal mediator at the City of Cambridge, MA, and as a Human Rights Commission advocate, settling cases prior to court filings to improve human conditions.

1

7. As documented in *Exhibit A & B*, Plaintiff, currently serving as an **Analog Astronaut** in the capacity of an **urban monk,** has been conducting faith-based uninterruptable research observations within a self-established tent and, at times, under open-air structures such as bridges (used as devotional pods/labs). Plaintiff has pursued this work consistently for over three years, with each stay lasting on average six months. These efforts of **living in unsafe conditions arose due to discrimination encountered** when attempting to pursue faith-based experiments in controlled environments such as **space dome-like biospheres** (e.g., the University of North Dakota's Inflatable Lunar Habitat). Such environments are critical analogs, approximating conditions necessary for Plaintiff's research into **faith-driven neural alignment** and the **cultivation of emerging neural colonies,** with applications in **neuroplasticity and cognitive enhancement.**

8. Plaintiff observed a fundamental absence of a **tailored human development framework,** and instead, the imposition of **intellectual segregation** enforced by a rigid, linear grading system. The only option presented—the traditional A–F grading scale—compelled Plaintiff to operate within an unjust framework, in which right-brain learning curves (creative, visionary, and artistic intelligence) were evaluated according to a left-brain scale (analytical, linear metrics), **while front-brain learning curves (divinity/devotional intelligence) have been entirely silenced.** Moreover, each of these three distinct brain regions follows its **own unaccounted pace** of practice. This systemic flaw ignores the multidimensionality of human intelligence and unfairly penalizes individuals whose strengths lie outside narrow analytical constructs.

9. Plaintiff has developed Spirit Theory. In everyday language, Spirit Theory is an earnest repentance to the forgiving love of Jesus Christ. In neuroscience definition, Spirit Theory is an intentional invocation of the prefrontal-brain cortex region of our brain — through prayerful activation, to unlock coherence, moral reasoning, and executive control — which are of greater integrative value than lateralized brain activations alone (Exhibit C). Spirit Theory establishes a frontier in bio-spiritual education, blending theology, science, arts, and professional disciplines. Spirit Theory helps us navigate the longest neural distance we ought to travel: that is, from our mind all the way to our heart (spirit). In the Bible, it is known as the Narrow Path. Spirit Theory, as Jesus' 1st fundamental science, when applied through neuroscience, holds national significance for the United States and humanity at large by enhancing **brain-state readiness** for mission-critical personnel such as soldiers, nurses, and doctors—those responsible for the continuity of life. Most importantly, it is the neural pathway to conduct a faith-led lifestyle that changes the dynamics of evolutionary biology to a resurrected life (as witnessed by Jesus Christ, the pioneer of this neural pathway). Spirit Theory integrated lifestyle choice equips one to think like a monk, fostering the resilience to withstand extreme duress, regulate body chemistry, and even hibernate reproductive hormones for extended periods, akin to a eunuch, when necessary for long-term missions. These advancements are essential not only for multi-planetary

colonization but also for addressing earthly challenges, including apocalyptic scenarios, armed conflict, and work-related migrations, by providing cohesive migration integration strategies, control mechanisms, and cognitive preparedness to endure global crises and frontline conflicts.

10. Plaintiff exemplifies the practical application of this science through **Bio-Spiritual Body Chemical Regulation**, achieved via a disciplined reliance on faith, rigorous lifestyle adherence as a graduated college virgin, and now, is in a committed five-year period of abstinence before marriage as a born-again believer. This demonstrates the seamless integration of **brain-state science, spiritual practice, and human resilience,** highlighting the potential for optimized performance, ethical alignment, and holistic mission readiness. Plaintiff, in his humble opinion, argues his observation stands among those who have contributed to the evolution of scientific thought on par with the scientific revolution, occurring ONCE EVERY 300 YEARS OF SCIENTIFIC REVOLUTION, with historic figures like Newton, whose work with the simple observation of an apple falling from a tree helped define the laws of classical physics. Newton's observation of an apple falling from a tree could be a seemingly trivial event that could be dismissed today as a joke. Likewise, Einstein's work on gravitational waves, which were only proven true after 100 years of theoretical speculation, has reshaped our understanding of the universe. Same thing with John McCarthy, the father of AI, who shared computational observations in 1956, which, 70 years later, is yet bound to revolutionize the world.

11. Faith-based education, as demonstrated by Plaintiff, fosters **human development, intellectual curiosity, and moral coherence**, surpassing conventional metrics of achievement. The suppression or limitation of gifted individuals such as Plaintiff impedes both national and global advancement, leaving the potential of this **bio-spiritual technology** underutilized in critical domains where societal and mission-critical performance is paramount.

12. To further enhance academic pedagogy and discourse on his observations (inventions), Plaintiff has created a new journal, **called Journal of Spirit Science & Standards (JSSS),** which currently humbly commands a new average of about 900 worldwide weekly readers (Exhibit E).

13. In line with the plaintiff's effort, President Trump, on 9/8/2025 has reinvigorated his new guidance and campaign America Prays to protect the right to prayer in public schools: "I am pleased to announce this morning that the Department of Education will soon issue new guidance protecting the right to prayer in our public schools," further reinforcing Plaintiff's initiative for frontal-brain and spiritual education.

## II. THE AMERICAN COGNITIVE AND MORAL CRISIS

14. The U.S. produces the highest number of PhDs globally but exhibits poor societal judgment due to left-brain analytic dominance and underdeveloped prefrontal cortex engagement.

15. Cancer prevalence exemplifies systemic failure; preventable cancers remain high due to lifestyle, stress, and poor judgment (Siegel RL et al., *CA Cancer J Clin.*, 2024). In contrast, Ethiopia, Plaintiff's country of birth, demonstrates societal health benefits correlating with balanced cognitive development.

16. Societies with rigid left-brain-dominant education, such as China, show high technical achievement but reduced PFC-related moral reasoning (Li et al., *Nat Hum Behav.*, 2020). Sound judgment would have deterred COVID from happening. That is why the US remains unrest from biological & tech advancements in the arms race. It is not a matter of strength or superiority, but a matter of brain state development.

17. Flattened, left-brain-dominant societies struggle to cultivate moral judgment, slowing progress against systemic hate. Marginalized communities—African Americans, Jewish populations—bear disproportionate impacts.

18. Spirit Theory integrates frontal-brain education with divinity to cultivate cognitive reserves, resilience, and ethical capacities critical for crisis response and societal coherence.

19. This initiative, communicated from the White House to other mission-critical agencies and local representatives (EXHIBIT D), represents America's single greatest opportunity to elevate its citizens through neural advancements and to forge global alliances based on inventors' newly formalized insights into brain states. These brain states enable individuals to attain the highest forms of human intelligence. Importantly, without a belief system anchored in Jesus, no form of decryption can occur, thereby opening the path for America to pioneer a robust bio-spiritual technological frontier. Historically, adversaries and global systems have operated within a "low-land" brain state, dependent on traditional educational structures that have persisted for over 2,000 years. By shifting toward a new socio-biomarker paradigm, America can secure a strategic advantage, allowing it to maintain majority influence even as its relative demographic position may decline globally. This transition should be seen as America's new and largest civilian infantry, positioned not only to defend but to lead in the evolution of human intelligence and spiritual integration.

## III. HISTORICAL AND CULTURAL CONTEXT

20. By leveraging Ethiopia's enduring heritage and its deep-rooted connection to Christian values—a tradition that resonates with the United States, where there are more churches per capita than anywhere in the world—this initiative seeks to present a stable, time-tested model for long-term societal strength. Rooted in devout practices, such as fasting for half of the year, Ethiopia exemplifies the joy of Christ

4

and a peace that transcends material circumstances (radiating smiley faces of its inhabitants living in a hut, which even sometimes confuses missionaries)—a state of mind which is only accessible through living by faith. This spiritual foundation fosters societal cohesion and the continuity of civilization.

21. The alliance between Ethiopia (preservation of divinity) and Israel (discovery of divinity) is longstanding, reflecting shared values and historical solidarity. A profound example is the 12th-century Rock-Hewn Churches of Lalibela, constructed during Israel's times of struggle and invasion. Ethiopia took the initiative to preserve the Christian tradition in a sacred space—an unparalleled act of devotion and alliance. Ethiopia's commitment to safeguarding its Christian heritage, without external prompting, demonstrates a bond that has endured for centuries, and this heritage has positively contributed to the social fabric of America.

22. Ethiopia holds a unique spiritual significance, being among the first Gentile nations to officially embrace Christianity outside the Jewish community (Acts 8, circa 4 AD). Its spiritual foundation was strengthened through the martyrdom of Matthew the Tax Collector and preserved through pivotal events such as the Battle of Adwa (1896), where divine providence is credited with Ethiopia's continued freedom. Guided by God-first societal norms and the teachings of Apostle Paul—who adapted Jewish church structures for New Testament believers—Ethiopia has maintained its sovereignty as Africa's only nation never colonized. (**Zephaniah 3:10 (NLT)** *"From beyond the rivers of Ethiopia, my worshipers, the daughter of my scattered people, will bring me offerings."*)

23. Ethiopia has also played a key role on the global stage: a co-founder of the United Nations, a founder of the African Union, and holder of the third UN seat after New York City and Geneva. It has maintained a 120-year alliance with the United States, including active collaboration in military operations, such as with the U.S. 7th Infantry Division during global crises. Recognized as America's oldest ally among six key nations in 1903, Ethiopia's relationship with the U.S. mirrors the strategic solidarity of NATO membership today. Notably, H.I.M. Emperor Haile Selassie was the first African leader to visit the White House in 1954, engaging with both government and non-government institutions, further cementing this historic bond.

## IV. FACTUAL ALLEGATIONS

24. Plaintiff's brain state observation contributes to a collective "brain colony" of initiatives that are already multiplanetary in scope, as he has initiative engraved onboard on the current Perseverance Mars Rover (ENGRAVED NAME, PERSON ID: M2M67054043344) and NASA's Moon Artemis 1 fly by lunar mission. Before exporting our decay on Earth, this insight helps streamline the campaigns I am leading, as described below.

25. This matter concerns symbolic significance—the naming of NASA's current Moon exploration initiative: the Artemis program. Artemis, a figure from ancient Greek mythology, is revered as the goddess of the moon, wilderness, and childbirth. More critically, however, she has historically been associated with pagan worship and rebellion against the living God. In Scripture, such figures often stand in direct contrast to the holiness and sovereignty of the Lord.

26. The Apostle Paul's ministry in Ephesus, recorded in Acts 19, illustrates the chaos and spiritual deception surrounding Artemis worship. The riot in Ephesus serves as a historical and spiritual warning regarding the dangers of elevating names or symbols that challenge the authority of Christ. To name a major American space program— funded by taxpayers and serving as a global emblem of technological aspiration— after such a figure constitutes, in effect, a spiritual declaration.

27. Just as naming a program "Jezebel" would rightly be perceived as glorifying rebellion and pride, so too does the name Artemis evoke a concerning parallel. In Scripture, Jezebel represents not merely a historical queen but a prophetic type of the spirit of seduction and defiance against God's prophets and people. Both names carry connotations of anti-Christ attitudes, opposing humility, truth, and righteousness.

28. As someone who honors God-given gifts in human creativity, scientific advancement, and space exploration, I do not oppose the mission itself. On the contrary, I firmly believe that our talents in science and discovery should be exercised with reverence, purpose, and submission to the Creator. Yet when names are attached that spiritually channel rebellion, we risk subtly aligning our work with pride rather than praise.

29. We must reexamine the symbolic weight behind Artemis and consider renaming the program in a way that aligns with virtue, humility, and honor before God. This is not superstition; it is about moral and spiritual alignment. Names shape culture—what we honor, we empower. Renaming Artemis would elevate its purpose, directing recognition toward the true source of wisdom and reinforcing the ethical integrity of America's scientific endeavors.

30. Plaintiff states that he aborted traditional theological or seminary programs (EXHIBIT G) because they are limited in their effectiveness, as they lack a "laboratory" component—an applied devotional aspect in divinity that integrates into mosaic form, blending principles with the practical implications of secular applied science. Such integration allows for the advancement of invention to measure the delta or divergence of coherence, for day-to-day actions exercised with or without engaging the prefrontal cortex region of our brain, rooted in revelations of faith.

31. Currently, Plaintiff has been conducting his research within a self-established camping tent (as a devotional pod ) for over three years due to discrimination faced when attempting to pursue faith-based experiments in space dome-like biospheres (such as at the University of North Dakota's Inflatable Lunar Habitat). These

environments approximate conditions for faith-driven neural alignment and the mastery of emerging neural colonies, including applications in neuroplasticity and cognitive enhancement.

32. Plaintiff asserts that it is time to bend and transform a 2,000-year-old legacy of academic pedagogy and world order by advancing a faith-adhering academic lifestyle and curriculum—anchored in a new *neural railroad plan* that welcomes Jesus at its foundation.

33. Society must shift its orientation toward the **front-brain**—the "brain CEO"—which is activated through faith-based practices such as prayer and worship. This stands in contrast to the current legacy academic and economic system, which is dominated by **left-brain (analytical)** thinking. The traditional academic and workplace performance frameworks no longer serve holistic human development.

34. Under the current system, students and workers are forced into linear performance measures, such as the A–F grading scale. This scale unfairly evaluates **front-brain intelligence** (activated through prayerful living to release gifts, talents, vision, and coherence) and **right-brain intelligence** (artistic and creative capacity) solely through a **left-brain lens**. This unjustly flattens the fullness of human intelligence into a single, narrow dimension.

35. Advancing this cause directly supports individuals with ADHD, PTSD, suicidal ideation, and other chemical imbalances, as well as faith-driven (gifted) and creative members of society who demand self-sufficiency and equal contribution within academic and workplace environments. It calls for the establishment of **parallel "NeuroMaverick" curricula** to stand alongside, and ultimately reshape, the status quo linear models.

36. An academic institution, in this vision, is not merely a place of learning but the **first medical institution for promoting wellness of the human condition**. It must cover the broad tenets of wellness and equality in order to nurture human potential.

37. This just cause is also about equipping civilians with a **"cognitive reserve"**—a kind of brain stamina already cultivated in mission-critical organizations. Cognitive reserve enables the human mind to withstand injury, disease, and the natural effects of aging, ensuring resilience for both individual and societal flourishing.

38. Spirit Theory is a theory of everything capable of addressing societal decay, defined as mistrust, erratic discourse, food chemicalization, mental health crises, and fragmented social integration (Putnam, 2000; Coleman, 1990; Kahneman, 2011). Plaintiff defines societal decay as a decline marked by pervasive mistrust in public and media institutions, erratic public discourse, food chemicalization, and deteriorating overall well-being. This decay manifests through gun violence, mental health crises, and the erosion of shared values that once sustained community cohesion.

39. From Plaintiff's perspective, societies worldwide—including the United States —are in the midst of a profound crisis. This crisis is not random but systemic: it is characterized by growing public distrust, generational fractures, and the inability of communities to form meaningful bonds. Plaintiff points out that the food supply is increasingly compromised, public conversation is chaotic and divisive, and the mental health of the population is steadily worsening. These are not isolated problems but symptoms of the broader societal erosion that undermines resilience and unity.

40. Plaintiff asserts that much of the decay in manufacturing and professional standards does not originate in entertainment centers such as Las Vegas, but rather within college campuses, where cultural and academic practices are, in combination, more detrimental than those associated with Vegas or Hollywood. Campus environments often reinforce casual sexual behaviors, "kiss cam" adultery exposed behaviors are born, and encourage unstable relationship patterns among students.

41. Plaintiff further observes that world-standard innovations and safety protocols— ranging from engineering to aviation—are compromised not only by diversity, equity, and inclusion (DEI) pressures but also by widespread academic dishonesty, including cheating and lecture pacing focused on memorization rather than deep understanding. The pressure placed on students at a young age creates neurochemical and hormonal stress responses, which many attempt to regulate through sexual activity or substance use.

42. Plaintiff asserts that these systemic conditions must change. By addressing the ethical, educational, and behavioral foundations within colleges, society can strengthen professional standards, safeguard public safety, and cultivate morally responsible, cognitively capable individuals.

43. A critical yet overlooked element, Plaintiff argues, is the absence of scientifically standardized approaches to **integration**—both **horizontally** (how newly arriving families adapt to society) and **vertically** (how different generations within the same society relate to one another). Plaintiff contends that these missing frameworks have allowed social fragmentation to deepen, perpetuating cycles of alienation and dysfunction across families, communities, and institutions.

44. Plaintiff emphasizes that human beings often operate from a "worm's-eye view," preoccupied with the immediate burdens of daily life and thus unable to recognize the broader structural forces shaping their well-being. Without access to a structured, "bird's-eye view" diagnostic framework, individuals and policymakers alike remain blind to overlapping challenges such as intergenerational disconnects, immigrant adaptation struggles, and the collapse of institutional trust. This blindness ensures that responses remain reactive—arriving only after crises have reached breaking points—rather than preventative or proactive.

45. In response, Plaintiff introduces **SYMMETRIC SCIENCE** as a proposed solution. This framework seeks to establish a system of structured training and diagnostics for evaluating the psychological and social state of both individuals and communities. By standardizing integration through measurable tools, SYMMETRIC SCIENCE would allow for analysis of how different groups—immigrants, generational cohorts, or marginalized communities—either contribute to or detract from societal resilience and cohesion.

46. Plaintiff maintains that such a system would not only provide policymakers, educators, and mental health professionals with quantifiable data but also shift society from crisis management to crisis prevention. Through evidence-based interventions, Plaintiff envisions a society capable of repairing its fractures, restoring its resilience, and rebuilding its shared values before breakdowns escalate into unmanageable dysfunction.

47. In sum, Plaintiff contends that the recognition and application of SYMMETRIC SCIENCE represents a crucial step toward halting societal decay and establishing a new standard for collective well-being, both in America and worldwide

48. Traditional grading and institutional systems flatten the diversity of intelligence and moral potential, ignoring right- and frontal-brain capacities.

49. Spirit Theory promotes Coherent Law (CL), a jurisprudence developed to activate the PFC, integrate the Sentient Wellness Cybernetic Feedback Loop, and prioritize the fruits of the Holy Spirit (kindness, joy, peace, mercy) in institutional and cultural environments (Mark 7:13; Luke 10:29).

50. Spiritual integration drives national resilience: critical personnel, including soldiers, nurses, and doctors, require bio-spiritual readiness to regulate body chemistry, sustain reproductive dormancy, and endure crises and multi-planetary challenges. This fundamental science (Spirit Theory), when applied, holds national significance for the United States and humanity at large by enhancing **brain-state readiness** for mission-critical personnel such as soldiers, nurses, and doctors—those responsible for the continuity of life. It equips them to think like a monk, fostering the resilience to withstand extreme duress, regulate body chemistry, and even hibernate reproductive hormones for extended periods, akin to a eunuch, when necessary for long-term missions. These advancements are essential not only for multi-planetary colonization but also for addressing earthly challenges, including apocalyptic scenarios, armed conflict, and work-related migrations, by providing cohesive migration integration strategies, control mechanisms, and cognitive preparedness to endure global crises and frontline conflicts.

51. Plaintiff exemplifies the practical application of this science through **Bio-Spiritual Body Chemical Regulation**, achieved via a disciplined reliance on faith, rigorous lifestyle adherence as a graduated college virgin, and a committed five-year period of abstinence before marriage as a born-again believer. This demonstrates the

seamless integration of **brain-state science, spiritual practice, and human resilience**, highlighting the potential for optimized performance, ethical alignment, and holistic mission readiness.

52. Faith-based education, as demonstrated by Plaintiff, fosters **human development, intellectual curiosity, and moral coherence**, surpassing conventional metrics of achievement. The suppression or limitation of gifted individuals such as Plaintiff impedes both national and global advancement, leaving the potential of this **bio-spiritual technology** underutilized in critical domains where societal and mission-critical performance is paramount.

53. Plaintiff asserts that what he is pursuing reaches beyond the capacities of both Einstein and himself, raising the urgent question: *what is the cost of limiting the intellectual curiosity of such individuals?* Rather than an "Einstein visa," what is needed is a **"Lord's Visa"**—as demonstrated in this petition—anchored in the recognition of **devotional intelligence** as greater than mere intellectual capacity.

54. The American Dream is not found in Ivy League schools, nor in the 2025-era burdens of mounting bills, but rather in state universities and everyday places where individuals are free to fail—and fail again, perhaps a thousand times—yet rise each time to learn from scratch. This cycle of perseverance reflects a limitless pursuit of discovery. Too often, individuals like Plaintiff become confused or stripped of identity in academic environments because of systemic gaslighting. In truth, many of us discover our true selves not in the classroom, but in the church. This is why I argue for the **"Lord's Visa"**—symbolized in Scripture by Joseph's *coat of many colors* (Genesis 37:3)—a marker of divine favor, giftedness, and resilience.

55. In Plaintiff's case, confirmation of spiritual and intellectual gifting did not come through secular channels, but rather from the pulpit. I cite my faith-based gift-and-talent test results from the church as testimony, reinforced by the teachings of respected leaders such as Apostle Joshua Selman, Bishop T.D. Jakes, and Pastor Joel Osteen (EXHIBIT H, PLAINTIFF'S SPIRITUAL GIFT ASSESSMENT TEST RESULT).

56. **Apostle Joshua Selman** teaches that the world is too wicked to let laws function as they should, for bias and manipulation hinder justice. Yet grace allows one to rise above opposition, just as Joseph overcame hatred, betrayal, and imprisonment to reach the throne God had prepared for him.

57. **Bishop T.D. Jakes** reminds us that "gifted people are always strange. They're always eccentric. They never fit in with other people. There's always something about them that stands out. The way they move, the way they dress, the way they think, the way they act. If you're a gifted person, you have to give up on fitting in with crowds and cliques and gloves and have the boldness and the tenacity to dare to be different. People don't follow ordinary. They only follow extraordinary. I have learned that God uses people the most that other people overlook. While some are fighting for the stage and hoping for the light and demanding to be recognized. They don't

understand that the people they're running past are the people that God is going to use the most. Some of you are extraordinary and you don't even know it. That's why you never fit in with your family and you never fit in with your friends and you never fit in with your community and no matter what you do to fit in people still don't like you. You change your hair they don't like you but God has set you aside so that he might use you outside of the box in a fresh way."

58. **Pastor Joel Osteen** proclaims that although one may *feel* ordinary, God calls His children extraordinary—equipped, anointed, and empowered for destiny.

59. This faith-driven perspective redefines the American Dream. As *Time Magazine* recently observed, the promise of upward mobility through hard work has become increasingly elusive for younger generations. AI displaces entry-level roles, many graduates are underemployed, and student debt burdens grow heavier. By 2024, nearly a third of Americans admitted that the American Dream is out of reach—its optimism fading. Yet faith insists on a higher dream: one not bound to shifting economies or legacy systems, but grounded in divine provision, resilience, and identity in Christ.

60. It must also be recognized that the law governing our society did not arise from Greek philosophy, Hindu texts, or the Quran, but from theology rooted in the Bible. We don't use Before Mohammed in calendar systems, rather Before Christ/After Christ due to the significance of the divinity in forming the humanity of Christ. Divinity, therefore, is not a private pursuit restricted to seminaries; it is the true foundation of just law and should be made equally accessible, just as public education is.

61. Plaintiff contends that the future of America's dream lies not in intellectual elitism but in faith-based **devotional intelligence**, which unlocks the fullness of human identity and societal flourishing. This is a case of civil liberty that transcends the boundaries of North Dakota State University (NDSU) and speaks to a larger global reality of a dis-spiritualized society—whether in China, Ethiopia, or the United States. Plaintiff highlights the urgent example of Ethiopia, where out of 1.7 million high school students who sat for the 12th grade national university entrance exam, only 55,000 were enrolled. Such an exclusionary outcome illustrates how legacy grading systems fail to account for the full dimensions of human intelligence and bio-spiritual potential.

62. Plaintiff contends that this is also a case for **bioethics** and **medical sociology**, because the grading and performance systems currently in place force entire populations—especially those culturally attuned to contemplative or monk-like states of being—out of their natural **PFC (prefrontal cortex) state of mind** and into a narrow left-brain scale. This narrowing, Plaintiff argues, creates America's new "headache" as a superpower: the responsibility of global hegemony, which carries with it the root question of whether true world peace can be sustained without a deeper understanding of brain states and spiritual intelligence.

11

63. Through Plaintiff's advocacy under **Spirit Theory**, the argument is made for a just cause of peace that is grounded in new equations such as *Spirit > Mind*, and systems like **Symmetric Science** and **Coherence Law.** These frameworks propose a rebirth of civilization—one not trapped in "failed state" thinking, like Rome, but one capable of transformation through parallel curricula that respect the timing needs of neuroplasticity. Such curricula would allow students with atypical attention, neurodiverse conditions, or spiritually gifted dispositions to thrive, rather than being flattened by one-dimensional academic systems.

64. Plaintiff emphasizes that people like him—whose existence as faith-rooted inventors is not recognized in any world educational system—find acknowledgment only in the United States, particularly through the U.S. government's recognition of his gifts under the EB1-A "Alien of Extraordinary Ability" pathway. For this, Plaintiff expresses gratitude. Yet he stresses that such recognition must not remain isolated but should extend to broader educational and social reforms.

65. Plaintiff proposes the creation of **neuro-traffic signs**—new ideological frameworks to bring balance where current political and educational discourse is polarized. In the same way America has been split into "red states" and "blue states," education can serve as the bridge to bring society to the center. Drawing from Plaintiff's own background as a mediator, he warns that without such integrative systems, the United States risks sliding toward "Civil War 2.0," as armed militias organize and polarization intensifies.

66. This urgency is magnified by the fact that America holds more guns than people. At traffic stops and in everyday interactions, unhealed traumas are triggered in society's most vulnerable members. Plaintiff asserts that trauma—and encounters with God—last forever. He calls for forgiveness, integrity, understanding, and education as tools to prevent further breakdowns, which can only formally be taught through divinity schools. For example, there are uninformed newly arriving families with a crime record for stealing a storefront's perks/benefits without being taught how much integrity is valued in their new home. Even if a student is not a believer in Christ, a divinity school can teach values, norms, and customs without coercing belief systems.

67. Plaintiff also argues that **invention as a field of divine revelation** has no degree or institutional credentials, and yet it is essential for nation-building. Universities can provide pathways, but the peace of the campus requires that ideas be allowed to emanate freely, to be dissected scholastically in classrooms, while campaigns and disputes be adjudicated in courts. Plaintiff insists that education must not be separated from faith, but rather must become the channel through which churches and communities funnel resources into organized nation-building grounded in both grace and science.

12

68. Plaintiff argues this is not simply a dispute about one university or one individual's rights—it is a case for reimagining civil liberty, education, and peace itself through the integration of bio-spiritual intelligence into the systems that shape society.

69. Plaintiff asserts that reconciliation with learning was ultimately discovered outside the classroom, through trial and error, rather than within formal academic structures. However, this pathway denied Plaintiff the opportunity for a **purposeful learning curve** within the classroom itself. Plaintiff observed a fundamental absence of a **tailored human development framework**, and instead, the imposition of intellectual segregation enforced by a rigid, linear grading system.

70. The only option presented—the traditional A–F grading scale—compelled Plaintiff to operate within an unjust framework, in which right-brain learning curves (creative, visionary, and artistic intelligence) were evaluated according to a left-brain scale (analytical, linear metrics), **while front-brain learning curves (divinity/devotional intelligence) have been entirely silenced.** Moreover, each of these three distinct brain regions follows its **own unaccounted pace** of practice. This systemic flaw ignores the multidimensionality of human intelligence and unfairly penalizes individuals whose strengths lie outside narrow analytical constructs.

71. For example, Plaintiff argues that an **artist should be permitted to sit in a physics classroom and be graded on the relevance of their contribution**—whether creative, conceptual, or interdisciplinary—rather than being forced into evaluation by the same scale that measures only left-brain analytical performance.

72. Such rigidity constitutes not only educational inequity but also a violation of civil liberty, as it suppresses giftedness, stifles innovation, and deprives individuals of the opportunity to contribute their full human potential to society.

73. Plaintiff asserts that **an economy is created out of thin air -- fundamentally shaped by an understanding** derived from **observations guided by divine revelation.** *Spirit Theory* seeks to restore the declining moral courage to engage in economic transactions driven not by purely numerical profit, but by obedience to serving the community's best interests—a source of prosperity historically neglected and undervalued.

74. Plaintiff demonstrates this principle through the compilation of his past and current initiatives, including his current voluntary innovative service of transforming old and abandoned books at North Dakota State University into reusable assets (Exhibit F.1). This effort leverages both artificial intelligence and spiritual intelligence to unlock extraordinary ability.

75. Excellence is no longer geolocked to Ivy League campuses; the American Dream is being revitalized at the state level, boosting local productivity and fostering community-driven prosperity. Divinity schools form the heartbeat of ethical

progress, guiding the moral framework within which economic and social initiatives operate.

76. Plaintiff further emphasizes the high cost of unethical scientific practices, such as those associated with the Wuhan laboratory, contrasting them with the potential of ethical, insight-driven research. Using computable frameworks, Plaintiff envisions peaceful partnerships—for example, between Russia, whose Slavic upbringing reflects an unbalanced interplay of faith and reason, and the USA, whose cultural upbringing emphasizes a faith-led pursuit of life goals. These partnerships can extend from space exploration to terrestrial cooperation. Globally, brain states vary: in the USA, populations are unevenly distributed across lowlands neural hikes (left or right), with a few highland neural hikes (frontal brain) communities participating in monastic-style cognitive and spiritual practices alongside Ethiopia and Hebrew traditions; meanwhile, in Russia and China, population and cognitive activity are concentrated in lowland hegemonies, shaping a reasoning-dominant neural and cultural dynamics. These observations represent systemic levels of brain activity, which Plaintiff is characterizing and interpreting through *Spirit Theory*, linking cognitive patterns to ethical, social, and economic frameworks.

77. This approach also provides Africa the opportunity to learn from global mistakes, restoring trust among nations at the advent of multilateralism. A new token of trust is established where the distinction between right and wrong is clarified, and international law—which previously lacked enforceability—now finds a tangible framework through incontestable equations and computable insights, capable of tracking drifts and losses just as precisely as weight loss is measured.

78. Plaintiff's expertise has garnered international attention, with companies worldwide seeking integration into his Visa- and Mastercard-like financial network and switch (*Spirit Economy, Exhibit F.2-F.3*), which is capable of spearheading America's global trade and alliance initiatives. This vision is informed by Plaintiff's prior diplomatic business experience and the treaty trade privileges conferred through E-2 Treaty Visa holdings by ten countries.

## V. LEGAL CLAIMS

### Count I – Equal Protection (14th Amendment)

79. NDSU discriminates against students pursuing divinity education while actively supporting secular disciplines, including engineering, agriculture, and the sciences, creating a clear **unequal treatment under the law**. The imposition of **intellectual segregation** enforced by a rigid, linear grading system is the only option presented—through a traditional A–F grading scale—forcing Plaintiff to operate within an unjust

framework, in which right-brain learning curves (creative, visionary, and artistic intelligence) were evaluated according to a left-brain scale (analytical, linear metrics), **while front-brain learning curves (divinity/devotional intelligence) have been entirely silenced.** Moreover, each of these three distinct brain regions follows its **own unaccounted pace** of practice. This systemic flaw ignores the multidimensionality of human intelligence and unfairly penalizes individuals whose strengths lie outside narrow analytical constructs.

79. By excluding divinity and faith-based programs, NDSU denies students access to educational opportunities that integrate moral, ethical, and spiritual development alongside technical or professional training. This is **not merely a curricular preference**; it constitutes **systemic discrimination** based on the religious or philosophical orientation of the student, which the Equal Protection Clause explicitly guards against.

80. Students seeking divinity education, like Plaintiff, are forced to pursue independent study outside the university, including conducting research in non-traditional settings, such as personal devotional spaces or improvised outdoor environments. This demonstrates tangible harm and unequal access to the **resources, faculty support, and institutional recognition** that secular disciplines routinely enjoy.

81. NDSU's policy perpetuates a **neuroconformant bias,** prioritizing left-brain analytic skills while marginalizing frontal-brain, moral, and spiritual capacities. By failing to recognize the integrative value of **prefrontal cortex (PFC) engagement through prayer, reflection, and ethical reasoning**, the university treats students with spiritual or bio-spiritual research interests as less deserving of academic recognition or institutional support.

82. This unequal treatment **impairs career advancement, vocational opportunities, and academic progression** for students pursuing divinity or faith-based programs, which directly violates the principles of equal protection by establishing a two-tiered system: one for secular disciplines and another for faith-driven or moral-development disciplines.

83. Plaintiff's experience demonstrates that these policies **disproportionately impact marginalized or underrepresented communities,** including students from religious or culturally diverse backgrounds, who are denied the same institutional support provided to peers in secular fields.

84. By enforcing a secular-only curriculum and denying divinity education, NDSU **effectively coerces students into abandoning faith-based research or intellectual pursuits** in order to remain eligible for academic recognition, awards, or graduation—further entrenching unequal treatment in violation of the 14th Amendment.

85. Plaintiff seeks relief from this unconstitutional discrimination to ensure that students of all faiths and philosophical orientations, including those engaged in Spirit Theory and bio-spiritual research, **receive equal access to academic programs,**

**resources, and institutional legitimacy**, consistent with the guarantees of the Equal Protection Clause.

86. The University's policy categorically distinguishes theology/religion from other academic disciplines, treating religious study as second-class. Such religious classifications are subject to strict scrutiny. In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (Kennedy), the Court held that a law "not neutral or not of general applicability" (one targeting a specific religion) "must be justified by a compelling governmental interest and narrowly tailored to advance that interest" (Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)). Likewise, in recent cases the Court struck down exclusion of religious entities from generally available public benefits: *Trinity Lutheran Church v. Comer*, 582 U.S. 449 (2017), invalidated Missouri's denial of a playground resurfacing grant to a church preschool(https://www.courthousenews.com/christian-students-challenge-virginias-exclusion-of-tuition-aid-to-theological-majors/#:~:text=The%20Supreme%20Court%20ruled%20in,religious%20groups) ; *Espinoza v. Montana Dept. of Revenue*, 591 U.S. ___, 140 S. Ct. 2246 (2020), held that Montana could not exclude religious schools from an otherwise neutral scholarship program(Espinoza v. Montana Department of Revenue, 591 U.S. ___ (2020)); and *Carson v. Makin*, 596 U.S. 767 (2022), struck Maine's rule barring tuition aid at religious schools as unconstitutional. These cases teach that government benefits or programs cannot single out religious institutions or viewpoints for disfavored treatment. By analogy, a public university offering secular majors but flatly banning divinity or theology majors similarly imposes a penalty on students for their religious viewpoint. That "viewpoint discrimination – i.e., discrimination because of the speaker's specific... perspective – [is] presumed impermissible" in public forums(Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995)).

87. *Trinity Lutheran v. Comer*, 582 U.S. 449 (2017): Missouri barred church daycare from a neutral playground grant program. The Court held that denying a generally available public benefit to a religious entity solely for its religious status violated the Free Exercise and Equal Protection guarantees (https://www.courthousenews.com/christian-students-challenge-virginias-exclusion-of-tuition-aid-to-theological-majors/#:~:text=The%20Supreme%20Court%20ruled%20in,religious%20groups) . Here, the University likewise withholds an educational "benefit" (access to a field of study) because of religion.

88. *Espinoza v. Montana Dept. of Rev.*, 591 U.S. ___ (2020): Montana's Constitution forbade aid to sectarian schools and cut off religious schools from a tax-credit scholarship program. The Court held that application of this "no-aid" rule violated Free Exercise (and accordingly could not be enforced)( Espinoza v. Montana Department of Revenue, 591 U.S. ___ (2020)). Montana thus could not condition a neutral educational benefit on abandoning religious schools. Analogously, excluding theology majors in higher education discriminates against religious education.

89. *Carson v. Makin*, 596 U.S. 767 (2022): Maine required that public tuition grants go only to nonsectarian schools. The Court, citing *Trinity* and *Espinoza*, invalidated this "nonsectarian" requirement as an unconstitutional penalty on religious exercise (https://www.courthousenews.com/christian-students-challenge-virginias-exclusion-of-tuition-aid-to-theological-majors/#:~:text=Three%20years%20later%2C%20the%20majority,for%20tuition%20assistance%20payments%20was). This reinforces that "government programs cannot discriminate on the basis of religious status" when providing educational benefits. A public university's theology ban similarly discriminates by religious status.

90. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993): Laws targeting religious practices (here, Santeria animal sacrifice) are not neutrally applied to secular conduct. The Court held that ordinances "not neutral" toward religion must meet strict scrutiny (Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)). The University's policy targets religious "speech" (theology courses) for exclusion; like the Lukumi ordinances, it is not generally applicable to all ideas and cannot survive absent a compelling interest.

91. *Locke v. Davey*, 540 U.S. 712 (2004): Washington barred use of a state scholarship for "devotional theology." The Court upheld the ban, but only by placing the case in the "play in the joints" between the Free Exercise and Establishment Clauses. Importantly, the Court noted that the scholarship program "does not appear to be driven by improper hostility toward religion"( Locke v. Davey, 540 U.S. 712 (2004)). In dissent, Justices Scalia and Thomas emphasized that the State gave "no justification for the facial discrimination against religion" and could have adopted less discriminatory alternatives (Locke v. Davey, 540 U.S. 712 (2004)). The Locke opinions implicitly recognize that if a government policy were actually hostile to religion, it would fail. Here, unlike Locke, the exclusion of theology has no plausible secular-neutral justification and appears to be rooted in excluding religious ideas per se.

## Count II – Free Exercise (1st Amendment)

92. **Hostility toward Religion:** The Supreme Court has stated that the Establishment Clause "forbids hostility" toward any religion. In cases like *McCreary County v. ACLU* (2005), the Court reiterated that the government cannot act with the purpose of disfavoring religion. By establishing colleges of law, medicine, engineering, and other fields while categorically refusing to establish a divinity school, the state university is arguably sending a message that religious scholarship is a lesser, illegitimate, or even unwelcome field of study. This would be a form of institutional hostility.

93. The categorical exclusion of divinity and faith-based programs at NDSU imposes substantial and undue burdens on religious students' academic, vocational, and civic opportunities. By preventing students from enrolling in programs that integrate theological study, moral reasoning, and spiritual formation with professional or

technical disciplines, NDSU **interferes with the free exercise of religious beliefs as they relate to educational and vocational development.**

94. Religious students, including Plaintiff, are forced to pursue independent study outside the university or at informal sites lacking institutional support, which **creates tangible barriers to the exercise of faith in an academic context**. This exclusion undermines their ability to practice religion in a holistic manner, where intellectual development, ethical reasoning, and spiritual formation intersect.

95. The burden extends beyond academics. Students denied access to divinity programs are **restricted in their vocational trajectory,** including careers in ministry, faith-based research, bio-spiritual sciences, counseling, and other roles that require integration of moral and spiritual knowledge with professional skills. By limiting these opportunities, NDSU **effectively conditions academic and career advancement on the abandonment of certain faith-based pursuits,** thereby infringing on constitutional protections.

96. Exclusion also curtails civic and community engagement. Many religious traditions emphasize the ethical responsibilities of knowledge application, moral leadership, and service. By restricting divinity education, NDSU **prevents students from fully participating in civic life according to their faith-informed convictions,** including leadership, advocacy, and community-based initiatives.

97. The suppression of divinity programs signals a preference for secular-only education, creating a **hostile educational environment for religious students**. This environment fosters marginalization and discourages the open practice of faith in public and academic spheres, which is contrary to the principles of the Free Exercise Clause.

98. Plaintiff's research, Spirit Theory, and bio-spiritual initiatives exemplify the constructive and nationally significant contributions religious students can provide when allowed to integrate faith with science, ethics, and professional development. Denying institutional support for such programs not only **violates the First Amendment** but also **stifles innovation, moral reasoning, and societal resilience** that could otherwise benefit both local and global communities.

99. Accordingly, Plaintiff seeks declaratory and injunctive relief to ensure that NDSU **fully accommodates and supports divinity and faith-based programs,** allowing religious students to freely exercise their beliefs in academic, vocational, and civic domains without undue burden.

100.   The ban on theology majors unconstitutionally burdens religious exercise. Students of faith are denied the ability to pursue their chosen discipline at the public university solely because it is religious in character. The Supreme Court has repeatedly struck down government rules that deny religious institutions or individuals equal participation in public programs. As noted, *Trinity Lutheran* held that excluding a church preschool from a recycling grant on account of its status violated the Free Exercise Clause (https://www.courthousenews.com/christian-students-challenge-virginias-exclusion-of-tuition-aid-to-theological-majors/#:~:text=The%20Supreme%20Court%20ruled%20in,religious%20groups)  .

*Espinoza* and *Carson* likewise treated blanket exclusions of religious schools from aid programs as forbidden discrimination(Espinoza v. Montana Department of Revenue, 591 U.S. ___ (2020)). These precedents establish that government policies denying public benefits solely for religious reasons violate free exercise. By analogy, categorically denying theology students access to public university programs burdens their free exercise without a compelling rationale.

101.     Moreover, under *Church of Lukumi*, laws burdening religious practices must be neutral and generally applicable or satisfy strict scrutiny(Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993)). A categorical ban on theology is not neutral – it singles out religious content – and therefore must be narrowly tailored. The University's policy cannot withstand this review absent a compelling interest of the kind Justice Rehnquist found nonexistent in *Locke*. Indeed, as *Locke* recognized, Washington could have funded theology degrees if it chose; the only reason it did not was a political judgment not mandated by the Constitution (Locke v. Davey, 540 U.S. 712 (2004)). Here, the University could include theology without violating the Establishment Clause (as many other states do), but it chooses to exclude it. Such viewpoint-based exclusion lacks any compelling justification and thus violates the Free Exercise Clause and the Equal Protection guarantee of religious equality.

## Count III – Academic Freedom (1st Amendment)

102.     NDSU's categorical exclusion of divinity education violates the principle of a "marketplace of ideas," a cornerstone of academic freedom recognized by the Supreme Court (*Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)). Academic freedom requires universities to **serve as arenas where diverse ideas, disciplines, and methodologies can be explored, challenged, and integrated.** By suppressing divinity programs, NDSU restricts an entire domain of knowledge from intellectual discourse, thereby undermining this constitutional and educational mandate.

103.     **Neutrality and Equal Access:** *Rosenberger v. University of Virginia* (1995). In *Rosenberger*, the Court held that if a university creates a public forum for student publications and funds a wide variety of secular publications, it cannot refuse to fund a student religious publication. To do so would be unconstitutional viewpoint discrimination. The university must remain neutral and provide equal access to the forum. The argument would apply this principle: A state university is a "marketplace of ideas." It provides a public benefit—higher education—and must do so neutrally. By creating schools for every major discipline except divinity, the university is not being neutral; it's engaging in unconstitutional viewpoint discrimination. It's essentially saying, "We will support and legitimize every field of study, except for those that involve religion."

104.     Divinity education encompasses not only theological study but also **moral philosophy, ethical reasoning, spiritual practice, and bio-spiritual integration**, all

of which are essential to a fully realized educational ecosystem. Exclusion of these programs **narrows the scope of scholarship** to secular-only perspectives, disproportionately privileging left-brain analytical disciplines while marginalizing right-brain creativity and frontal-brain moral reasoning, which Plaintiff's Spirit Theory demonstrates are critical for societal resilience.

105.     The suppression of divinity programs prevents students from **investigating the intersections of science, ethics, and theology**, denying them access to methodologies that foster integrative thinking, reflective judgment, and holistic problem-solving. For example, research in bio-spiritual neuroscience shows that **prefrontal cortex activation through prayer and moral reflection enhances executive decision-making, empathy, and cognitive flexibility** (Azari NP, 2001; Brewer JA, 2011; Newberg AB, 2003). By blocking formal institutional access to such studies, NDSU **obstructs students from engaging with cutting-edge research that blends spiritual and scientific inquiry**, an infringement on the academic freedom to explore all relevant fields.

106.     Plaintiff's independent research and development of Spirit Theory exemplify **how divinity-informed scholarship contributes to national and global intellectual progress**, from cultivating moral leadership to advancing bio-spiritual technologies for mission-critical personnel and multi-planetary preparedness. NDSU's refusal to recognize such programs **limits the potential societal benefits of intellectual exploration** and stifles innovation that could otherwise emerge from an inclusive academic environment.

107.     Beyond research, academic freedom encompasses **the right to teach, debate, and apply knowledge without institutional censorship.** By denying divinity education, NDSU inhibits faculty and students from pursuing courses, projects, or experiments in ethics, theology, and moral reasoning that are central to the development of well-rounded, civically responsible, and spiritually aware graduates.

108.     The exclusion of divinity programs thus **flattens the intellectual landscape**, favoring only secular, analytic learning paradigms. This approach **undermines holistic education, violates First Amendment protections, and contradicts the long-standing principle that universities must encourage exploration, dissent, and interdisciplinary integration.**

109.     Plaintiff respectfully requests that the Court declare NDSU's policy unconstitutional and order the establishment of divinity programs or integrative curricula that **allow students to exercise full academic freedom in exploring the moral, spiritual, and scientific dimensions of knowledge**, consistent with the principles articulated in *Keyishian v. Board of Regents*.

110.     Public universities must remain "markets of free and open debate," and may not impose ideology-based curriculum restrictions. *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (Brennan), squarely held that "academic freedom is a special concern of the First Amendment" and "laws… casting a pall of orthodoxy over the classroom" cannot stand (Keyishian v. Board of Regents, 385 U.S. 589 (1967)). In *Healy v. James*, 408 U.S. 169 (1972), the Court reaffirmed that the college classroom

20

"is peculiarly the marketplace of ideas," where diverse perspectives must compete. Likewise, *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), warned that teachers and students "must always remain free to inquire, to study and to evaluate," or academic inquiry will wither. Each of these decisions underscores that viewpoint discrimination undermines the university's mission.

111.     By flatly excluding theology, the University imposes a viewpoint orthodoxy: religious perspectives are banished from academic discourse. This is precisely the type of restriction Keyishian and Healy forbid. Moreover, in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Court struck down a public university's refusal to let a Christian student group use campus facilities, holding that once a forum is opened to student use the state may not exclude religious speech without compelling interest. Here, the University has opened virtually all disciplines to academic inquiry but refuses the religious dimension. *Rosenberger v. Rector of UVA*, 515 U.S. 819 (1995), similarly invalidated a university's denial of funding to a Christian student publication as unconstitutional viewpoint discrimination. The Court emphasized that "[t]he exclusion of several views... is as offensive to the First Amendment as the exclusion of only one" (Rosenberger v. Rector and Visitors of the University of Virginia, 515 U.S. 819 (1995)). Excluding theology majors eliminates an entire class of viewpoints (both religious and their secular critiques) from the campus marketplace.


**Count IV – International Human Rights Law**

112.     NDSU's exclusion of divinity programs also violates international human rights standards that affirm the right to education as **accessible, equitable, and oriented toward full human development**, including moral, ethical, and spiritual dimensions. Specifically:

113.     **Universal Declaration of Human Rights (UDHR), Article 26(2), 1948**: "Education shall be directed to the full development of the human personality and to the strengthening of respect for human rights and fundamental freedoms. It shall promote understanding, tolerance, and friendship among all nations, racial or religious groups, and shall further the activities of the United Nations for the maintenance of peace." By excluding divinity education, NDSU **prevents students from engaging with ethical, spiritual, and cross-cultural learning**, which is essential to the "full development of the human personality" and to fostering moral reasoning capable of promoting social cohesion and global understanding.

114.     **International Covenant on Economic, Social and Cultural Rights (ICESCR), Article 13(1), 1966**: "Higher education shall be made equally accessible to all, on the basis of capacity, by every appropriate means, and in particular by the progressive introduction of free education." This provision explicitly emphasizes **equal access to education that develops the whole person**, including moral, ethical, and spiritual capacities. NDSU's secular-only policy **denies students with**

21

**religious or spiritual interests the opportunity to engage in such educational experiences,** thereby violating their rights under ICESCR.

115.     NDSU's policy also **discriminates against students whose academic, vocational, and civic development relies on the integration of theology with other disciplines.** By offering secular education while suppressing divinity programs, the institution **creates inequitable conditions,** where students seeking holistic development are excluded from opportunities available to their peers pursuing secular-only disciplines.

116.     The principles enshrined in UDHR and ICESCR underscore that **education is not merely vocational or technical but inherently tied to human dignity, moral reasoning, and the cultivation of conscience.** Plaintiff's research in Spirit Theory demonstrates that **frontal-brain activations through prayer, ethical reflection, and integrative moral education** significantly enhance executive functioning, empathy, and resilience. Denying formal access to divinity programs **prevents students from achieving these internationally recognized educational outcomes,** contravening U.S. commitments to uphold human rights standards.

117.     Moreover, NDSU's exclusion undermines the United States' **international credibility and leadership in promoting human rights and equitable education.** As a signatory to ICESCR and a promoter of UDHR principles, the U.S. has obligations to ensure that **all forms of higher education, including those cultivating spiritual and ethical capacities, are equitably accessible.** The suppression of divinity education signals a failure to meet these obligations.

## VI. BRIEF SUMMARY OF LEGAL REFERENCES + OTHER NOTEWORTHY CASES

### Count I – Equal Protection (14th Amendment)

- **Larson v. Valente, 456 U.S. 228 (1982).**
  Government may not favor some denominations over others; denominational preferences trigger *strict scrutiny*.

- **Grutter v. Bollinger, 539 U.S. 306 (2003).**
  Universities have a duty to promote diversity in ideas; excluding divinity undermines equality of intellectual opportunity.

### Count II – Free Exercise (1st Amendment)

- **Sherbert v. Verner, 374 U.S. 398 (1963).**
  Denial of benefits burdening religious practice requires compelling interest and least restrictive means.

22

- **Wisconsin v. Yoder, 406 U.S. 205 (1972).**
  Protects religious education choices; compulsory secular-only education cannot override sincere faith practice.

- **Church of Lukumi Babalu Aye v. Hialeah, 508 U.S. 520 (1993).**
  Laws targeting religion are unconstitutional if not neutral or generally applicable.

- **Trinity Lutheran v. Comer, 582 U.S. 449 (2017).**
  Excluding a church from a neutral public benefit program violates Free Exercise.

- **Espinoza v. Montana Dept. of Rev., 591 U.S. ___ (2020).**
  State cannot exclude religious schools from public scholarship programs.

- **Carson v. Makin, 596 U.S. 767 (2022).**
  No distinction between "religious status" and "religious use"; exclusion of divinity use still unconstitutional.

- **Tandon v. Newsom, 593 U.S. ___ (2021).**
  If secular activities are allowed but religious ones restricted, *strict scrutiny* applies.

- **Fulton v. Philadelphia, 593 U.S. ___ (2021).**
  Discretionary exemptions mean the law is not generally applicable — triggers strict scrutiny.

- **Kennedy v. Bremerton, 597 U.S. ___ (2022).**
  Protects individual prayer in public institutions; Establishment Clause is not a license to suppress Free Exercise.

- **Locke v. Davey, 540 U.S. 712 (2004).**
  Narrow exception allowing states to exclude training for clergy; important for distinguishing your case (broader divinity education ≠ clergy subsidy).

_____

**Count III – Academic Freedom (1st Amendment, "Marketplace of Ideas")**

- **Sweezy v. New Hampshire, 354 U.S. 234 (1957).**
  Academic freedom is a special constitutional concern; government cannot dictate limits on fields of inquiry.

- **Keyishian v. Bd. of Regents, 385 U.S. 589 (1967).**
  Universities are "marketplaces of ideas"; suppressing divinity is unconstitutional censorship.

- **Healy v. James, 408 U.S. 169 (1972).**
  Universities are not immune from the First Amendment; denial of recognition based on viewpoint is unlawful.

- **Papish v. Bd. of Curators, 410 U.S. 667 (1973).**
  University cannot punish speech just because it is offensive; supports protecting controversial theological study.

- **Widmar v. Vincent, 454 U.S. 263 (1981).**
  Public universities cannot exclude religious groups from facilities once opened to student groups.

- **Rosenberger v. UVA, 515 U.S. 819 (1995).**
  Denying funds to religious student media is viewpoint discrimination.

- **Board of Regents v. Southworth, 529 U.S. 217 (2000).**
  Mandatory student fees must be allocated on a *viewpoint-neutral* basis; applies to academic program funding.

- **Lamb's Chapel v. Moriches UFSD, 508 U.S. 384 (1993).**
  Exclusion of religious perspective from a public forum violates viewpoint neutrality.

- **Good News Club v. Milford, 533 U.S. 98 (2001).**
  Schools cannot exclude religious groups from limited public forums based on their religious viewpoint.

---

## VII. ORDER FOR RELIEF

Plaintiff respectfully requests that this Court:

- Declare NDSU's exclusion of divinity education unconstitutional;
- Order the establishment of a School of Divinity
    - **a)  integrating traditional theology education in stand alone,**
    - **b)  parallel regular attendance course education that gives daily devotional allowance to be exercised (e.g. No classes before 11am)**
    - **c)  parallel theology course blended with applied secular curriculum (e.g, Chemistry From Applied Theology, Quantum Superposition Applied Theology, Systems Biology in Applied Theology, Neuroscience Applied in Theology, Financial Engineering Applied in Theology, Differential Equation Applied in Theology) along with status quo science, arts, and professional disciplines;**
    - **d) allowance for neuroplasticity developmental pace in educational settings with self-paced courses upon students' choice or request to support neurodiverse students (ESPECIALLY HONORING VETERANS), including artists and those with ADHD, PTSD, or other conditions affected by traditional linear educational grading;**

24

- Recognize and support bio-spiritual research and applied curricula for neural, moral, and societal advancement;

---

## VIII. APPENDIX: SPIRIT THEORY AND FRONTAL-BRAIN NEUROSCIENCE

1. Spirit Theory posits PFC engagement via prayer, reflection, and integrative moral education produces superior societal and cognitive outcomes.

2. PFC activation enhances executive control, ethical reasoning, empathy, and resilience (Azari NP, 2001; Brewer JA, 2011; Newberg AB, 2003).

3. Integrating divinity with sciences creates a bio-spiritual mosaic, strengthening societal judgment, reducing systemic harm, and fostering moral leadership.

4. Coherent Law operationalizes Spirit Theory by embedding spiritual and ethical accountability into legal and institutional systems.

5. SYMMETRIC SCIENCE provides a standardized framework to measure societal integration, cognitive reserves, and resilience across generational, cultural, and immigrant populations.

6. Exhibits C include diagrams of brain-state activations, Spirit Theory integration, and neural curricula models.

---

## REFERENCES (LEGAL + PUBMED + INTERNATIONAL)

- Keyishian v. Bd. of Regents, 385 U.S. 589 (1967)
- *Healy v. James*, 408 U.S. 169 (1972)
- *Sweezy v. New Hampshire*, 354 U.S. 234 (1957)
- *Widmar v. Vincent*, 454 U.S. 263 (1981)
- *Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819 (1995)
- *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)
- *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)
- *Espinoza v. Montana Dept. of Rev.*, 591 U.S. ___ (2020)
- *Carson v. Makin*, 596 U.S. 767 (2022)
- Locke v. Davey, 540 U.S. 712 (2004)
- Azari NP, et al. Eur J Neurosci. 2001;13(8):1649–1652. PMID: 11328396
- Brewer JA, et al. Neuroreport. 2011;22(17):1719–1723. PMID: 22045381
- Newberg AB, Iversen J. Med Hypotheses. 2003;61(2):282–291. PMID: 12888302
- Siegel RL, et al. CA Cancer J Clin. 2024;74(1):17–48. PMID: 38175804
- Li et al., Nat Hum Behav. 2020;4:865–874. PMID: 32686616
- Peraton. Cognitive Convergence: Winning the Invisible War (2024)

*PSalm 37.3*

- UDHR, Article 26(2), 1948
- ICESCR, Article 13(1), 1966
- Putnam, R. Bowling Alone. 2000
- Coleman, J. Foundations of Social Theory. 1990
- Kahneman, D. Thinking, Fast and Slow. 2011
- Wilkinson, R., & Pickett, K. The Spirit Level. 2018
- Portes, A., & Rumbaut, R. Immigrant America. 2001
- Sampson, R., Raudenbush, S., & Earls, F. Neighborhoods and Violent Crime. 1997

EXHIBITS : A, B, C

ON NEXT SUBSEQUENT PAGES

September 10, 2025

GEIFU, KIRUBEL ZELALEM

1100 19th AVE N.
StE J
FARGO, ND 58102